IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

SCOTT SMITH,

                Plaintiff,

      vs.

H.C.F. MEDICAL UNIT D.P.S., et al.,

                Defendants.

CIVIL NO. 19-00600 JAO-KJM

**ORDER DENYING PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION; AND DISMISSING COMPLAINT WITH LEAVE TO AMEND**

**ORDER DENYING PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION; AND DISMISSING COMPLAINT WITH LEAVE TO AMEND**

Plaintiff Scott Smith ("Plaintiff") alleges that various officials at Halawa Correctional Facility ("HCF") violated his rights under the Eighth Amendment by failing to provide adequate medical care. *See* Compl., ECF No. 1. In two separate motions, he asks the Court to issue a temporary restraining order ("TRO") and a preliminary injunction ordering officials to provide certain care such as a specific pain medication and housing in a single cell. *See* ECF No. 2 ("Motion for a Tempor[ar]y Restraining Order and Preliminary Injun[c]tion"); ECF No. 14 ("Motion for Immediate Cease and Desist Order") (collectively, "Motions for a

Temporary Restraining Order and a Preliminary Injunction"). For the reasons

stated below, Plaintiff's Motions are DENIED and his Complaint is DISMISSED

WITH LEAVE TO AMEND.[1]

## I.    BACKGROUND

### A.    Facts

Plaintiff is incarcerated in Halawa Correctional Facility ("HCF"). On June

7, 2019, Plaintiff underwent a total laryngopharyngectomy and bilateral neck

dissections at Queen's Medical Center ("Queen's") to address a locally advanced

squamous cell cancer adenoma of the post-cricoid/cervical esophagus with a

nonfunctional larynx. *See* ECF No. 8-1 ("Mee Decl.") ¶ 4.[2] Since returning to

HCF on July 1, 2019, Plaintiff has been housed in the HCF infirmary and

continuously monitored by nursing staff, *see id.* ¶ 5, and has complained of pain,

---

[1] Plaintiff also asks the Court to order his release because his state sentence was unconstitutional or alternatively seeks compassionate release. Plaintiff has not shown these requests are properly before the Court; a person in custody from a state court judgment must exhaust state judicial remedies by presenting the highest state court available with a fair opportunity to rule on the merits of every issue before seeking habeas relief based on those same issues in federal court. *See* 28 U.S.C. § 2254(b), (c); 28 U.S.C. § 2244(d)(1). The Court therefore will not address these requests at this time. Nor will the Court address Plaintiff's request for damages, which is not properly before the Court at this time.

[2] The Court may rely on hearsay when considering a motion for a preliminary injunction. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).

*see id.* ¶ 9; ECF No. 2-2 at 1–2.  Because the surgery removed his voice box, he cannot verbally communicate.[3]  *See* ECF No. 1-1 at 7; ECF No. 2-2 at 4.  The surgery left Plaintiff with a stoma (an open hole in his neck), making him prone to infection[4] and requiring him to use tools to clean the stoma and breathing and suction machines to assist with moisturizing his lungs.  *See* ECF No. 1-1 at 30, 32–36; ECF No. 2 at 1-2; ECF No. 2-1 ("Smith Decl.") ¶ 4; ECF No. 2-2 at 3–4.  HCF staff provided Plaintiff with sterilized tools to care for his stoma and also a filter to cover his stoma that, when worn, reduces the risk of a lung infection to that of someone without a stoma.  Assily Decl. ¶¶ 8–9.

On August 19, 2019, Plaintiff's longtime oncologist, Dr. Melvin Palalay, prescribed pain patches containing Fentanyl to treat what Plaintiff describes as constant pain, including in the form of headaches and joint pain, which makes it difficult for him to function.  *See* Smith Decl. ¶¶ 2–3, 5; ECF No. 1-1 at 2, 26; ECF No. 2 at 4–5; ECF No. 2-2 at 1–2.  Plaintiff complains that officials at HCF refuse

---

[3]  Plaintiff communicates using a dry erase board and marker, *see* ECF No. 39-2 ("Assily Decl.") ¶ 14; ECF No. 39-1 ("Supp. Mee Decl.") ¶ 14, and also whispers and mouths words to HCF staff and medical professionals, *see* Supp. Mee Decl. ¶ 14.  He received a voice box device, but had issues using it and was recently referred to speech therapy at Queen's to teach him how to use it.  *See* Supp. Mee Decl. ¶¶ 15–18; ECF No. 42 ("Second Supp. Smith Decl.") ¶ 16.

[4]  Plaintiff has had no infections to his stoma since returning to the HCF infirmary after his surgery.  *See* Assily Decl. ¶ 11.

to provide him Fentanyl patches and that one of the doctors who refuses to do so, Dr. Kevin Maguire, is negligent. *See id.* Dr. Maguire concluded that Plaintiff did not need Fentanyl because, among other things, Plaintiff had been observed cleaning his cell, doing push-ups, and had undisturbed sleep, and Plaintiff's then-current pain management treatment of Oxycodone was under consideration for a *lower* dosage.[5] *See* Mee Decl. ¶ 11.

Dr. Maguire also discussed Plaintiff's pain management plan with Dr. Palalay; Dr. Palalay deferred to HCF's pain management plan but requested referrals for a PET-CT and brain MRI, which were approved (again, these showed no metastases). *See id.* ¶¶ 9, 11. Dr. Mee, the Medical Director of the Department of Public Safety, Health Care Division, also attests that Fentanyl patches are not necessary to treat Plaintiff's pain because Fentanyl is not indicated for cluster headaches, and instead poses certain risks for that condition, as well as other safety and security risks. *See id.* ¶¶ 1, 12. In September, Dr. Mee approved a requested referral to pain management for Plaintiff. *See id.* ¶ 14. More recently, when Plaintiff has complained about a headache or ringing in his ears, HCF has provided him pain medication, including Oxycodone. *See id.* ¶¶ 14–16. Although another one of Plaintiff's physicians recommended a repeat PET scan, Plaintiff refused the

---

[5] After Plaintiff returned from surgery, his pain medication was increased based on complaints that it was ineffective, but MRI brain and PET/CT scans showed no metastases. *See* Mee Decl. ¶ 9.

scan, *see id.* ¶ 13, but claims he did so because he was in extreme pain, *see* ECF No. 15 ("Supp. Smith Decl.") ¶ 22.

Aside from objecting to his pain medication, Plaintiff also complains that prison staff have not always provided him a single cell while at the infirmary. Defendants acknowledge that, since returning to HCF in July, Plaintiff has had a cellmate in the infirmary: (a) on August 20, 2019 (cellmate treated for diabetes); on (b) September 10, 2019 (same cellmate again treated for diabetes); and (c) from October 8, 2019 through December 4, 2019 (cellmate treated for cardiac condition).[6] *See* Assily Decl. ¶ 12. Plaintiff states that after his surgery, doctors and nurses at Queen's discussed whether Plaintiff should be housed in a single cell. Smith Decl. ¶ 4; ECF No. 1 at 3; ECF No. 2 at 1–2; ECF No. 2-2 at 3–4. However, Defendants contend that no medical professional has determined that a single cell is medically necessary for Plaintiff. *See* Assily Decl. ¶ 5.

Plaintiff complains that cellmates pose a risk to his health because of his susceptibility to infection, and cellmates may interfere with and contaminate the tools he needs to clean his stoma. He also points to threats he previously received

---

[6] Although it is unclear, Plaintiff appears to claim he had no cellmate from December 7 through December 24, but that someone moved in on December 24, 2019. *See* ECF No. 37 at 7. He also attests that, after Defendants filed their supplemental responses, he was assigned another cellmate, and while he complains about some of that cellmate's conduct, he acknowledges that the cellmate is "passive." *See* ECF No. 42 at 18, 23.

from a cellmate about running his machines at night (which he claims he stopped using for a time to avoid confrontation, but now maintains he will continue using even if he is assigned a cellmate). *See* Smith Decl. ¶ 4; ECF No. 2-2 at 3–4; ECF No. 37 at 9. His medical records, though, do not contain any complaints or reports about cellmates interfering with his tools, threatening him, or obstructing his stoma, *see* Mee Decl. ¶ 7; Supp. Mee Decl. ¶ 13, and he now maintains he will *not* let other inmates interfere with his tools, *see* ECF No. 37 at 9. His outside care providers did not specify any special needs regarding Plaintiff's stoma care. *See* Supp. Mee Decl. ¶ 12. While Plaintiff must share a cell when necessary to treat other inmates, HCF staff issued a memo on September 27, 2019 providing that Plaintiff be housed in a single cell when the infirmary population allows. *See* Mee Decl. ¶ 6; Assily Decl. ¶ 6. And when double celling Plaintiff is necessary, the HCF Medical Unit staff screens and assesses cell assignments on a case-by-case basis, e.g., assessing any potential cellmate's custody level and classification status, whether the patient is infected with a communicable disease and level of communicability, whether the patient has been admitted for treatment or observation, and a general assessment of the patient's needs. *See* Assily Decl. ¶¶ 7, 13.

Plaintiff also complains about bite marks, which he attributes to parasites and claims only became an issue when he was housed with cellmates. *See* ECF

No. 1 at 3.  Plaintiff acknowledges he received scabies cream on November 4, 2019, which provided relief from small red bites, and also received other types of cream for larger welt-type bites.  *See* ECF No. 37 at 8; *see also* Supp. Mee Decl. ¶¶ 4–10.  And he submitted a medical needs memo, dated November 4, 2019, which contains instructions about proper washing of linens and showering and indicates he was prescribed cream.  *See* ECF No. 37-2 at 2.

## B.    Procedural History

Plaintiff filed a Complaint and Motion for a Temporary Restraining Order and Preliminary Injunction on October 30, 2019.  *See* ECF Nos. 1–2.  The Court directed the Office of the Attorney General to file a response to Plaintiff's motion.  *See* ECF No. 5.  The Attorney General opposes the motion on behalf of Defendants HCF Medical Unit, Department of Public Safety ("DPS"), Dr. Kevin Maguire, and Dr. Dean Hatakeyama.  *See* ECF No. 8.  The Court held a hearing on Plaintiff's motion on November 19, 2019.  *See* ECF No. 20.  Plaintiff was present in court and, although representing himself and unable to speak, was able to communicate using certain technology.[7]

---

[7]  Plaintiff typed his responses into a word processing program, and those responses appeared in real time on monitors throughout the courtroom.  The Court then read Plaintiff's typed responses into the record and the typewritten responses were preserved and made a part of the record.  *See* ECF Nos. 20, 20-1.  A detailed description of these procedures can be found in the transcript of the hearing, where the Court discussed these procedures on the record.

At the hearing, it was apparent that Plaintiff had difficulty participating, so the Court offered Plaintiff the opportunity to seek a continuance until a time when pro bono counsel could assist him.[8] Plaintiff requested a continuance to secure counsel and so that he not be required to travel to court for any later proceedings.[9] On November 20, 2019, the Court stayed Plaintiff's motion until pro bono counsel could make an appearance. *See* ECF No. 22. On December 4, 2019, the Court directed Plaintiff to file a response indicating his position regarding whether the stay should remain in place while pro bono counsel was sought, or whether the Court should resolve Plaintiff's motion without the assistance of counsel. *See* ECF No. 28. In light of Plaintiff's response, *see* ECF No. 31, the Court left the stay in effect until pro bono counsel was appointed, indicating it would reassess the status of the stay if no counsel appeared by January 10, 2020. *See* ECF No. 34. On January 13, 2020, the Court concluded that it was necessary to lift the stay and ordered Defendants to provide certain responses to questions the Court intended to ask at the prior hearing, and also permitted Plaintiff to respond to this submission. *See* ECF No. 38. Defendants filed their submission, *see* ECF No. 39, and Plaintiff

---

[8] Plaintiff's request for the appointment of counsel was granted in part and referred to the civil pro bono panel. *See* ECF Nos. 6, 19.

[9] On November 19, 2019, Plaintiff supplemented his filings with a "Motion for Immediate Cease and Desist Order," ECF No. 14, which raises the same issues presented in his initial motion for a temporary restraining order or preliminary injunction.

filed his response, *see* ECF No. 42.

## II.    LEGAL STANDARD

The standards for granting a TRO and a preliminary injunction are identical. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). To succeed, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that finding for the moving party is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "All four elements must be satisfied." *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (citation omitted). The Ninth Circuit follows the "sliding scale" approach, labeled the "serious questions" test. *Id.* (citations omitted); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, a stronger showing on one element might offset a weaker showing on another element; thus, "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs*, 938 F.3d at 992 (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1135).

## III.    DISCUSSION

The Court concludes that Plaintiff has not met his burden of demonstrating he is eligible for a TRO or preliminary injunctive relief at this time.

**A. Likelihood of Success on, or Serious Questions Going to, the Merits**

    **1. "Deliberate Indifference" under 42 U.S.C. § 1983**

This case was brought under 42 U.S.C. § 1983,[10] and predicated upon a violation of the Eighth Amendment's proscription against cruel and unusual punishment. A violation of the Eighth Amendment occurs when prison officials are deliberately indifferent to a prisoner's medical needs. *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). To prove an Eighth Amendment violation as to an individual defendant, a plaintiff must "'objectively show that he was deprived of something "sufficiently serious," and 'make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety.'" *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir.

---

[10] To the extent Plaintiff named DPS, HCF, or the HCF Medical Unit as Defendants, he cannot demonstrate likely success or serious questions going to the merits because such entities are not "persons" under § 1983 and, as arms of the State of Hawaiʻi, are entitled to Eleventh Amendment immunity in federal court absent a showing of waiver—which Plaintiff has not made here. *See Pauline v. State of Hawaii Dep't of Pub. Safety*, 773 F. Supp. 2d 914, 922–23 (D. Haw. 2011); *Thomas v. O.C.C.C. Dental Unit*, Civil No. 08-00587JMS-LEK, 2009 WL 196191, at *2 (D. Haw. Jan. 27, 2009). Because Defendants have not raised any objection, though, for purposes of this motion, the Court will presume Plaintiff named the individual Defendants in their official capacities. *See Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th Cir. 2000) (recognizing exception to Eleventh Amendment immunity "for prospective declaratory and injunctive relief against state officers, sued in their official capacities, to enjoin an alleged ongoing violation of federal law").

2010) (quoting *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009)).

Deliberate indifference requires a showing that "prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety" and that there was no "'reasonable' justification for the deprivation, in spite of that risk." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 844 (1994)) (footnotes omitted). This requires a state of mind derived from criminal recklessness; that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). "If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk." *Toguchi v. Chung*, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (alterations omitted) (quoting *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002)) (footnote omitted). Still, officials may be aware of the risk because it is obvious, i.e., if the evidence known to him or her is such that he or she must have known of the risk. *See Thomas*, 611 F.3d at 1151–52; *see also Toguchi*, 391 F.3d at 1057 n.4. But neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Plaintiff's claims are based on alleged indifference to his medical needs and denial of medical care. To prevail on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must show that: (1) he had a serious medical need (by demonstrating a failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain); and (2) the defendant's response to the need was deliberately indifferent. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Indifference is shown by (a) a purposeful act or failure to respond to pain or a medical need and (b) harm caused by that indifference (although this harm need not be substantial). *See Jett*, 439 F.3d at 1096. Indifference in this context "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *McGuckin*, 974 F.2d at 1059 (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Yet, an "[a]n inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (citations omitted).

## 2.     Denial of Pain or Other Medications

Plaintiff cannot demonstrate likely success on or serious questions going to the merits of his claim that denying him Fentanyl patches constitutes deliberate

indifference because pointing only to a disagreement between Plaintiff's physicians and HCF's medical providers does not carry his burden under § 1983. *See Snow v. McDaniel*, 681 F.3d 978, 987–88 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc). Rather, Plaintiff "must show that the course of treatment the [HCF] doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [Plaintiff's] health."[11]  *Id.* at 988 (internal quotation marks and citation omitted).  Plaintiff has not shown he will likely be able to meet this burden.

Since returning to HCF, Plaintiff has been housed at the infirmary, monitored by nurses, and provided with a pain management plan and other pain relief on an as-needed basis.  *See* Mee Decl. ¶¶ 9 4–16; Assily Decl. ¶¶ 10, 15–16. Based on his medical assessment of Plaintiff, Dr. Maguire disagreed with Dr. Palalay's decision to prescribe Fentanyl and, after the two physicians discussed Plaintiff's pain management plan, Dr. Palalay deferred to HCF's plan.  *See* Mee Decl. ¶ 11.  Dr. Mee further explained that opiates such as Fentanyl are not indicated for Plaintiff's condition of cluster headaches and could cause withdrawal

---

[11]  A court can assess whether the treatment decision of responsible prison authorities was medically acceptable by "considering the record, the judgments of prison medical officials, and the views of prudent professionals in the field." *Edmo*, 935 F.3d at 786.

headaches, pose other health risks when used for conditions like chronic

headaches, and pose other safety risks at HCF.[12]  *See id.* ¶ 12.  Dr. Mee thus

confirmed that Fentanyl was not medically necessary to treat Plaintiff's pain.  *See*

*id.*  At most, then, Plaintiff has shown a difference of medical opinion between his

physician and those at HCF, which cannot support a claim of deliberate

indifference.[13]  *See Toguchi*, 391 F.3d at 1060; *but see Edmo*, 935 F.3d at 786–91

(concluding prison medical official's competing medical opinion was medically

unacceptable under the circumstances and affirming district court's findings

---

[12]  Plaintiff claims other inmates at HCF have received "pain patches" in recent months, although not specifying whether these patches contain Fentanyl, *see* ECF No. 15 ¶ 18, and admitting they may *not* have contained Fentanyl, *see* Second Supp. Smith Decl. ¶ 19.  Defendants acknowledge that in the past decade four infirmary patients received patches containing Fentanyl (most recently in 2016), all of whom were terminally ill, in hospice care, and received it for end-of-life pain and suffering.  *See* Assily Decl. ¶¶ 3–4.  There is insufficient evidence that Plaintiff similarly qualifies for Fentanyl on this basis.

[13]  Indeed, other courts in this Circuit have denied similar claims where prison physicians refuse to provide a plaintiff with stronger pain medications (including Fentanyl) for legitimate medical reasons.  *Cf. Schaefer v. Multnomah County*, Case No. 3:18-cv-00039-SI, 2019 WL 1246193, at *5 (D. Or. Mar. 18, 2019) ("Defendants have established that their decision to treat Plaintiff's pain with oxycodone, Gabapentin, and ibuprofen, instead of Plaintiff's preferred treatment of stronger, highly addictive narcotics [including Fentanyl], did not disregard an excessive risk to inmate health and safety." (citation omitted)); *see also Gieck v. Levin*, No. 05–CV–01974–H(RBB), 2010 WL 235084, at *11 (S.D. Cal. Jan. 21, 2010), *aff'd*, 457 F. App'x 650 (9th Cir. 2011) (no deliberate indifference where doctors disagreed about strength of pain medication plaintiff needed, particularly in light of evidence that plaintiff received additional pain medication on as-needed basis and other times refused treatment).

crediting plaintiff's medical experts over prison medical official who lacked expertise in area and did not follow accepted standards of care in that area).

For similar reasons, to the extent Plaintiff seeks injunctive relief to address his skin complaints, he has failed to demonstrate likely success on or serious questions going to the merits. The evidence shows Plaintiff is regularly monitored in the infirmary and over the course of over three months received treatment for these issues, including in the form of different ointments and/or creams based on medical staff's assessments, and most recently was referred to a provider to assess his skin complaints. *See* ECF No. 1 at 3; Mee Decl. ¶ 5; ECF No. 37 at 8; ECF No. 37-2 at 2; Supp. Mee Decl. ¶¶ 3–10. This treatment included HCF medical staff initiating a scabies protocol based on Plaintiff's concerns—even though the presence of scabies was not confirmed—and then prescribing different creams when staff assessed him as having a different condition unrelated to scabies. *See* Supp. Mee Decl. ¶¶ 7–10. While Plaintiff maintains he did have scabies, he acknowledges that one of the creams Defendant provided gave him relief for certain bites. *See* Second Supp. Smith Decl. ¶¶ 8, 12; ECF No. 37 at 8. At most, Plaintiff *may* be able to demonstrate negligence or medical malpractice, but this is insufficient to demonstrate that he is likely to succeed in establishing that prison staff were deliberately indifferent to his medical needs by knowing about, but

disregarding, an excessive risk to his health.[14]  *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990); *Hallett v. Morgan*, 296 F.3d 732, 744–45 (9th Cir. 2002); *Gieck*, 2010 WL 235084, at *12 ("The Court concludes that Defendants were not deliberately indifferent to Plaintiffs' [sic] recurrent skin infections because the evidence demonstrates that Plaintiff was treated with a variety of antibiotics.").  Thus, Plaintiff is not entitled to preliminary injunctive relief on either of these grounds.

### 3.    Denial of Single Cell Housing

Plaintiff also contends that Defendants have been deliberately indifferent in denying him a single cell given the high risk of infection after his surgery and his stoma.  It is unclear whether Plaintiff has submitted sufficient evidence to support that Queen's medical officials concluded it was medically necessary to house Plaintiff in a single cell *indefinitely*.  *Compare* Smith Decl. ¶ 4 (attesting that at meeting after his surgery among Queen's staff and HCF staff "one topic was because of the high risk of infection and the specialized tools and equipment should be house single cell only for health and safety reasons"), *with* Assily Decl. ¶ 5 ("There has been no assessment by any medical professional that a single cell is

---

[14]  Plaintiff's proffer regarding photographs of some of his lesions does not alter this conclusion.  *See* ECF No. 42-1.  The Court therefore DENIES Plaintiff's request of the Court to contact his criminal defense counsel to obtain the photographs.  *See* ECF No. 43.

medically necessary for Plaintiff.").  Regardless, Defendants' evidence supports that HCF medical professionals have concluded that a single cell is not medically necessary for Plaintiff.  *See* Assily Decl. ¶¶ 5, 7, 12–13.  Plaintiff thus has not shown he is likely to succeed on this claim, because at most his complaints amount to a difference in medical opinions.  *See Martin v. Hedgpeth*, No. C 12–3193 CRB (PR), 2014 WL 3884287, at *4 (N.D. Cal. Aug. 7, 2014) ("Unfortunately for plaintiff, Dr. Sepulveda's denial of another doctor's recommendation that plaintiff be granted single cell status amounts to no more than a difference of medical opinion insufficient to establish deliberate indifference to serious medical needs." (citing *Toguchi*, 391 F.3d at 1059-60)).

Nor has Plaintiff shown on this record that HCF's differing assessment was medically unacceptable or demonstrated a conscious disregard of an excessive risk to his health.  There is evidence that Defendants have continually monitored Plaintiff's medical status at the infirmary since his return, Plaintiff's stoma has not become infected, and HCF medical personnel engage in a case-by-case assessment before double celling Plaintiff at the infirmary, which only becomes necessary if the infirmary population requires it.[15]  *Cf. Foster v. McDonald*, 346 F. App'x 217, 219 (9th Cir. 2009) (no deliberate indifference where plaintiff presented no facts

---

[15]  HCF staff issued a memo in September that Plaintiff could be housed in the infirmary by himself as long as space is available.  *See* Assily Decl. ¶¶ 6–7, 10–11, 15–16.

that defendant knew or should have known that double celling placed plaintiff's safety at risk and plaintiff no longer qualified for single cell under state's single-cell policy); *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1051–52 (9th Cir. 2002) (concluding reasonable officer would not perceive risk of double celling inmate who killed his cellmate to be so high as to be constitutionally impermissible where inmate had been under observation for two weeks and was back on medication since earlier incident involving aggressive behavior toward another cellmate, prison staff made no recommendation of single celling inmate, and inmate had been housed safely with yet another cellmate for several days before murdering victim).

Plaintiff complains about being forced to balance his safety against his need to engage in post-surgical care and reports that a former cellmate threatened him for using his medical machines at night, which prompted Plaintiff to stop using those machines in order to avoid confrontation with future cellmates.[16] ECF No. 2-2 at 3–4. He also complains about the risks associated with inmates contaminating the tools he uses to clean his stoma, although there is no evidence that this has actually occurred (rather than Plaintiff merely being concerned it may occur). *See id.* Regardless, Defendants offered evidence that they were unaware of these

---

[16] Plaintiff indicates that cellmate asked to be moved before things escalated, but there is no indication Defendants were or should have been aware the cellmate posed a physical or medical threat to Plaintiff. *See* ECF No. 2-2 at 4.

risks, attesting that "Plaintiff's medical records do not contain any complaints or reports made by Plaintiff regarding threats made by cellmates or of other inmates tampering with Plaintiff's tools and equipment." Mee Decl. ¶ 7; *see also* Supp. Mee Decl. ¶ 13 (no record of reports by Plaintiff of tampering with equipment or stoma). Nor is there evidence that Defendants had reason to know of these risks: Defendants provide him sterilized tools for stoma care, he has a filter to cover his stoma to reduce the risk of infection, the record contains insufficient evidence that he has had any lung infections or post-surgical stoma issues in the months since returning to HCF, and monitoring at the infirmary is such that any potential infection could be evaluated and addressed immediately.[17] *See* Supp. Mee Decl. ¶ 12; Assily Decl. ¶¶ 8–11. Plaintiff's concession that he stopped using his machines for a time to avoid confrontation and disciplinary write-ups underscores that he is not likely to show Defendants have deliberately ignored a known, excessive safety risk to Plaintiff's health. *See* ECF No. 2-2 at 4; *see also* ECF No. 37 at 9 (indicating that, if he is housed with someone at the infirmary, he will not turn off his machines or let the cellmate touch his tools, and then speculating this could lead to physical altercations).

---

[17] Defendants submit evidence indicating the various methods by which Plaintiff can communicate with HCF medical personnel notwithstanding his lack of a voice box, *see* Assily Decl. ¶¶ 14–16; Supp. Mee Decl. ¶¶ 14–18, and that HCF medical staff are capable of responding to Plaintiff's request for immediate care within minutes, *see* Assily Decl. ¶¶ 14–16.

Even where a medical issue creates a *known* conflict with other inmates, other courts have rejected Eighth Amendment claims when a plaintiff is denied a single cell. *See Blue v. Grannis*, No. CIV S–05–1256 GEB EFB P, 2009 WL 347742, at *1–3, *6–8 (E.D. Cal. Feb. 11, 2009), *report and recommendation adopted*, 2009 WL 728502 (E.D. Cal. Mar. 19, 2009), *aff'd sub nom. Blue v. Scavetta*, 372 F. App'x 754 (9th Cir. 2010). In *Blue*, a plaintiff with sleep apnea was denied a single cell even though his snoring and C-PAP machine were alleged causes of physical and verbal altercations with cellmates, which included cellmates disrupting his sleep. *See id.* The district court in *Blue* recognized that certain medical conditions may warrant a single cell, but concluded there was no evidence of deliberate indifference in denying a single cell because the plaintiff did not qualify for a single cell under the prison's policy, which was "grounded in the legitimate interest in dealing with a heavy prison population." *See id.* at *7. This was so even though a medical official at the prison had previously and temporarily approved plaintiff for a single cell. *See id.* As in *Blue*, Plaintiff is unlikely to succeed on his claim to the extent it is based on alleged risks of cellmates interfering with his machines or tools because these risks were unknown to HCF staff, there is insufficient evidence the risks have come to fruition in over six months, and HCF medical staff never concluded that a single cell was medically

necessary for Plaintiff.[18]

Thus, at this time, and on this record, the Court concludes Plaintiff has not demonstrated he is likely to succeed on the merits of his claim because the record does not support that Defendants have deliberately ignored a known, excessive medical risk to Plaintiff that has or will result in harm.  *See Toguchi*, 391 F.3d at 1059.  In light of Defendants' differing medical opinion regarding the medical necessity of a single cell, daily and continuous monitoring of Plaintiff, and case-by-case assessment of any potential cellmate, Plaintiff has not shown that Defendants' response to the risks posed by Plaintiff's post-surgical condition is unacceptable under the circumstances.  The risks Plaintiff complains of and their resulting effects are conjectural[19] and so do not suffice to justify imposing the extraordinary remedy of emergency or preliminary injunctive relief at this time.

---

[18]  As Ms. Assily attests:  "There has been no assessment by any medical professional that a single cell is medically necessary for Plaintiff."  Assily Decl. ¶ 5.  The memo providing that Plaintiff can be provided a single cell when the infirmary population allows is not to the contrary.  That memo merely provides that Plaintiff may be given priority for a single cell; it does not alter the fact that HCF medical staff have not yet determined that housing Plaintiff in a single cell indefinitely is *medically necessary* in light of his condition and that of his past and/or present cellmates.

[19]  For example, there is insufficient reliable medical evidence in the record that Plaintiff faces an imminent risk to his health due to his post-operative status, *see* Supp. Mee Decl. ¶ 11; Assily Decl. ¶¶ 10, 16, even if Plaintiff continues to speculate that cellmates render him susceptible to certain risks, *see* Second Supp. Smith Decl. ¶ 25 (speculating how a potential cellmate places Plaintiff at risk).

For these reasons, the Court **DENIES** Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [ECF No. 2].  As Plaintiff's "Motion for Immediate Cease and Desist Order" [ECF No. 14] raises the same issues presented in his initial motion for a temporary restraining order or preliminary injunction, it is similarly **DENIED** for the reasons stated herein.

## B.    Dismissal of Complaint

Plaintiff's Complaint, as currently pled, fails to comply with both the Federal Rules of Civil Procedure and the Local Rules of this District.  Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Each allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).  A plaintiff must also state his claims "in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  Fed. R. Civ. P. 10(b).  And under this District's Local Rules, "[a]ll prisoner complaints . . . shall be signed under penalty of perjury and legibly written or typewritten on approved court forms available on the court's website or from the clerk's office and [d]ocuments that do not substantially conform to court forms may be stricken or dismissed."  LR99.2(a).  Plaintiff's Complaint fails to comply with these requirements, including because his allegations require exhaustive reference to his subsequent filings in this case.  *See* ECF No. 1. Further, in light of this fact and given the Court's discussion above regarding his

motion for injunctive relief, it does not appear that Plaintiff has stated a plausible claim for relief within his Complaint as currently pled. *See* ECF No. 1; *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

For these reasons, the Court **DISMISSES** Plaintiff's Complaint **WITH LEAVE TO AMEND**. Plaintiff shall file an amended complaint addressing the deficiencies set forth in this Order no later than **March 16, 2020**. Failure to file an amended complaint by that date may result in dismissal of the action.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motions for a Temporary Restraining Order and a Preliminary Injunction [ECF Nos. 2, 14]. Plaintiff's Complaint [ECF No. 1] is **DISMISSED WITH LEAVE TO FILE AN AMENDED COMPLAINT** no later than **March 16, 2020**.[20]

//

//

---

[20] On February 12, 2020, Plaintiff filed a "Motion to immediately have a cease and desist order on Caroline Mee," ECF No. 44, requesting an "order for Caroline Mee to cease and desist any and all involment [sic] with the Plaintiff's health care or any type of decision [sic] or anything to do with Plaintiff" because he asserts Dr. Mee withheld a certain drug that treats his blood. ECF No. 44 at 1–2. This allegation, however, is unrelated to those asserted by Plaintiff in his initial Complaint, which had alleged he was not provided a specific pain medication nor housing in a single cell, and thus this motion is DENIED. Any amended complaint filed by Plaintiff may include new allegations, and Plaintiff may thereafter file a TRO or preliminary injunction based on the amended complaint.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, February 13, 2020.



Jill A. Otake
United States District Judge

Civil No. 19-00600 JAO-KJM, *Smith v. H.C.F. Medical Unit D.P.S.*, ORDER DENYING PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION; AND DISMISSING COMPLAINT WITH LEAVE TO AMEND

24